**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KIMBERLY COWAN,

       Plaintiff,

v.                                                                           ACTION NO. 2:12cv559

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

       Defendant.

### UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

    Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

    This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated December 31, 2012. This Court recommends that the decision of the Commissioner be AFFIRMED.

### I.  PROCEDURAL BACKGROUND

    The plaintiff, Kimberly Cowan ("Plaintiff"), filed an application for DIB on November

---

[1] The Commissioner of the Social Security Administration has changed from Michael Astrue to Carolyn Colvin. It is ORDERED that the style of the case shall be deemed amended to substitute as the sole respondent in this proceeding Carolyn W. Colvin, Acting Commissioner of Social Security.

30, 2010, alleging he had been disabled since May 27, 2009. R. 120-127.[2]  The application stemmed from a sleeping disorder along with other medical issues. The Commissioner denied Plaintiff's application, both initially on October 16, 2008, (R. 90-94), and upon reconsideration on June 19, 2009, (R. 97-103).

At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on February 29, 2012, and an impartial vocational expert testified. R. 44-68. On March 27, 2012, the ALJ issued a decision denying Plaintiff's claim. R. 12-21. On August 23, 2012, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. 1-3.

Having exhausted all administrative remedies, Plaintiff filed a complaint with this Court on October 11, 2012.  ECF No. 1. Defendant filed an Answer to the Complaint on December 19, 2012. ECF No. 4. On January 15, 2013, an Order was entered directing the parties to file Motions for Summary Judgment. ECF No. 7. Plaintiff's Motion for Summary Judgment was submitted on February 14, 2013. ECF Nos. 8 & 9. Defendant Commissioner's Motion for Summary Judgment was filed on March 15, 2013. ECF No. 10 & 11. On March 29, 2013, Plaintiff filed her Reply to Defendant's Motion for Summary Judgment. ECF No. 12. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Plaintiff was 38 years old at the time of her ALJ hearing. R. 49. Plaintiff is a high school graduate (R. 49), and she last worked as an assembler and a packer. R. 50. Plaintiff filed her application for DIB on December 13, 2010, alleging sleep apnea, narcolepsy, high blood pressure, high cholesterol, and left-arm rotator-cuff tear, all which she allege limits her ability to

---

[2] Page citations are to the administrative record previously filed by the Commissioner.

work. R. 120-127, 155. The date of the alleged on set is May 27, 2009. R. 155. She later noted that she also experiences right-arm pain when she lifts her arm. R. 183. Plaintiff has enough quarters of insurance to remain covered through December 31, 2014. R. 12.

*Medical Issues with Sleep Apnea*

On March 26, 2008, Plaintiff reported to Hemang Shah, M.D., of Tidewater Neurologists and Sleep Disorder Specialists that she was now working the day shift and was sleeping well at night. At that time, she took Ritalin during the day and was staying awake. Her narcolepsy was considered "stable with Ritalin." R. 263.

On May 14, 2008, Plaintiff reported to Dr. Shah that the Ritalin helped with her sleepiness. Dr. Shah diagnosed Plaintiff with narcolepsy, but noted that it was "stable with medication." R. 262.

On October 9, 2008, I. A. Barot, M.D., of Neurology Consultants and Sleep Disorders Center, conducted a new-patient consultation for Ms. Cowan's suspected narcolepsy. R. 214. Dr. Barot noted that Plaintiff was diagnosed in the past with narcolepsy and was prescribed Ritalin. R. 214. Plaintiff reported a history of "nocturnal snoring, pathological daytime sleepiness, witnesses choking episodes during sleep, sleep paralysis, hypnagogic hallucination, parasomnias, including vivid dreaming and nightmares, and episodes of cataplexy." R. 214. She also reported falling asleep while driving. R. 214. Dr. Barot suspected Plaintiff had significant obstructive sleep apnea-hypopnea syndrome and possible narcolepsy. R. 215. Dr. Barot scheduled sleep testing. R. 215. The tests showed that Plaintiff had sleep apnea, R. 218, and narcolepsy, R. 219.

On October 27, 2008, Dr. Barot diagnosed Plaintiff with sleep apnea and narcolepsy. R. 212. Dr. Barot planned to have Plaintiff undergo a nasal CPAP titration and planned to eventually wean Plaintiff off of Ritalin. R. 212. He also advised Plaintiff to avoid driving and

operating heavy machinery if she felt sleepy. R. 212.

On November 17, 2008, Dr. Barot noted that Ms. Cowan's condition was unchanged since her last visit. R. 211. Plaintiff elected to start using nasal CPAP therapy and had no major complaints when using the CPAP. R. 211. Plaintiff elected to use the CPAP therapy at home and Dr. Barot advised her that use for six or more hours per night could improve her sleep and reduce daytime sleepiness. R. 211.

On December 22, 2008, Plaintiff reported "significant consolidation in her sleep and improved levels of daytime alertness," but otherwise her condition remained unchanged. R. 210. Plaintiff indicated that she started to work again at her previous workplace. R. 210. Dr. Barot again advised Plaintiff to not drive or operate heavy machinery if she felt too sleepy. R. 210.

On February 23, 2009, Dr. Barot found that Plaintiff was "doing very well," but she was taking the CPAP mask off at night so she was not receiving the full benefit. Plaintiff was refitted for a new mask. R. 209. Similarly, on April 20, 2009, Dr. Barot found that Plaintiff was "doing extremely well on a combination of Sodium Oxybate, low dose Ritalin LA, and nasal CPAP therapy." R. 209. Dr. Barot stated that Plaintiff was wearing the mask more regularly and saw "a clear benefit" and an "increased [] work functional capacity." R. 208.

On July 2 and July, 16, 2009, Plaintiff went to see Dr. Barot. Dr. Barot opined that the Sodium Oxybate "has clearly benefitted the quality of her sleep and improved levels of daytime alertness," R. 207, but Plaintiff was not complying with using the CPAP mask, R. 206, 207. Plaintiff had gained a significant amount of weight and suffered from CPAP intolerability. R. 207. As a result, She was refitted for a CPAP mask. R. 206, 207. Based on testing Dr. Barot changed her mask and CPAP pressure. R. 206.

On September 24, 2009, Plaintiff reported that she was using Sodium Oxybate every

night. R. 205. She was less compliant with her nasal CPAP because of a shoulder problem, but she expressed to Dr. Barot that wanted to start using it more regularly. R. 205. She stated that she was "now planning to restart working in the near future." R. 205.

A couple of years after her last visit with Dr. Barot, Plaintiff returned to Dr. Barot on November 10, 2011. R. 581. She reported that she was not doing well and had residual fatigue, nocturnal awakenings, insomnia, and mask discomfort. R. 581. Dr. Barot ordered CPAP setup and a polysomnography, and ordered sleep testing. R. 582.

On December 1, 2011, Plaintiff followed-up with Dr. Barot regarding her sleep apnea. Although the sleep studies showed abnormal sleeping patterns, during a multiple sleep latency test, Plaintiff exhibited "no clear evidence of narcolepsy." R. 574, 576. Dr. Barot advised Plaintiff of a number of strategies to aid her sleeping. R. 574.

*Medical Issues with Shoulder, Neck and Back Pain*

Plaintiff initially hurt her left shoulder on March 17, 2009, while using a torque gun at her assembly-line job. R. 398. On March 18, 2009, Plaintiff reported to her primary care physician that she experienced neck and upper back pain, which spread to her right shoulder. R. 237. She reported the same to the Patient First facility on March 18, 2009. Plaintiff stated that there was no numbness or weakness, her upper extremities were without deficits, and the left-shoulder x-ray was normal. R. 506. Rosa Javier, M.D., at Patient First, diagnosed Plaintiff with a left shoulder sprain. R. 506.

On April 15, 2009, Plaintiff went to Arthur Wardell, M.D. R. 240. Dr. Wardell noted that her upper arm and forearm circumferences were symmetric, as was her grip strength. He did note that there was left trapezius tenderness and spasm and a 25% reduction in neck rotation to the left and other pain when Plaintiff moved to the left. R. 340. He ordered electrodianostic testing

5

and physical therapy. R. 340. An April 23, 2009 left-arm EMG and nerve study came back normal with no evidence of radiculopathy. R. 352-53. Plaintiff returned to Dr. Wardell on April 29, 2009 and reported she was still in pain and had been working "light duty" at work. R. 340. She reported injections in her left shoulder helped somewhat. The examination of her left shoulder showed that Plaintiff had full abduction and 170 degrees of flexion. R. 340. Plaintiff declined trigger point injections and was to continue physical therapy. R. 340.

On a May 28, 2009 visit, Plaintiff reported she was not doing any better. R. 339. On June 29, 2009, Ms. Cowan returned to Dr. Wardell with complaints of no improvement with her left shoulder and that she was experiencing swelling. R. 339. Examination of the neck revealed full range of motion with left trapezius tenderness, as well as right trapezius tenderness. R. 339 Examination of the elbow revealed full range of motion with some tenderness on extension. Examination of the shoulder revealed left deltoid tenderness with full range of motion with flexion. R. 339. Dr. Wardell recommended that Ms. Cowan undergo an MRI of the cervical spine and the left shoulder. R. 339.

A June 30, 2009 left-shoulder MRI showed "unfused os acromionale with associated fluid in proliferative changes," which suggested "chronic instability," and the MRI showed a torn supraspinatus. R. 349. But her cervical-spine MRI was unremarkable, and in his review, Dr. Wardell noted there was no abnormality. R. 339, 350-51.

On July 2, 2009, in visiting Dr. Wardell, Plaintiff complained of pain and Dr. Wardell believed Plaintiff had a rotator cuff tear. R. 339. He recommended surgery. R. 339. On August 3, 2009, Dr. Wardell performed surgery to repair Plaintiff's torn left rotator cuff. R. 347. From August 2009 through March 2010, Plaintiff went to physical therapy to improve her left-shoulder pain, range of motion, strength, and functionality. R. 336, 385-448. Following her surgery,

Plaintiff presented to Dr. Wardell four times and each time reported shoulder pain and her examinations reveal varying levels of pain. R. 337. During this period, Dr. Wardell expressed that the physical therapy was helping, and advised that Plaintiff could return to light-duty work on October 26, 2009. R. 560.

On February 24, 2010, a Harbour Rehab physical therapist evaluated Plaintiff's left shoulder for a baseline evaluation following her surgery. R. 341. It was noted that Ms. Cowan provided good, consistent effort while performing her baseline evaluation and her subjective complaints matched her objective findings. R. 341. Evaluation of her left shoulder revealed:

> range of motion revealed shoulder flexion at 11% loss on left, shoulder extension at 21% loss on right, shoulder external rotation at 8% loss on right, shoulder abduction at 18%loss on left and 46% loss on left. Evaluation of shoulder muscle strength showed shoulder flexion of 50% loss on left, shoulder extension at 10% loss on left, shoulder abduction at 25% loss on left, shoulder adduction at 14% on left, shoulder external rotation at 6% loss on left and shoulder internal rotation at 26% loss on left.

R. 341-342. The physical therapist concluded that Plaintiff demonstrated slight loss of shoulder[3] mobility and moderate to significant loss of strength, and that Plaintiff reached a plateau in her progress and was discharged from physical therapy. R. 341-42.

On June 22 and 23, 2010, Harbour Rehab conducted a functional capacity evaluation. The evaluation determined that Plaintiff had slight to moderate decreased active range of motion of the left shoulder and a similar reduction in grip strength. R. 335-357. Plaintiff was unable to complete the lift test because of a sharp pain in her shoulder when lifting more than 30 pounds. R. 377. Also, Ms. Cowan reported that she felt she could not safely lift any more weight for fear of further injury to her shoulder. R. 377.

The study concluded that Plaintiff could function at the light physical demand level. R.

---

[3] The report states in its there was a slight loss of right shoulder mobility. *See* R. 341-42. However, the Court believes this is a typographical mistake because the entire discussion and testing was completed on the left shoulder and the evaluation makes clear this report is on the left shoulder. *Id.*

355-58. The study also concluded that Plaintiff could work an eight-hour day with a number of restrictions including: a number restrictions on weight Plaintiff can lift, needing to limit use of left upper extremity when doing forward bent work or rotational work (twisting), no ladder climbing, no repetitive reaching, no working overhead, and limitations in fine motor/dexterity work and speed/placement work. R. 383-384.

On July 2, 2010, Dr. Wardell noted that Plaintiff complained of left-shoulder tightness and aching, but she maintained 140 degrees of elevation despite impingement. R. 558.

On October 1, 2010, Plaintiff reported her shoulder pain was unchanged and that she had worsening pain in her left elbow. R. 335. However, Dr. Wardell stated that Plaintiff's "[l]eft shoulder elevation is full," and that Plaintiff reached maximum medical improvement and her functional capacity evaluation revealed that she could perform light work. R. 558.

On November 29, 2010, Dr. Wardell noted that Plaintiff had left-shoulder elevation limitations, impingement, and tenderness. He prescribed Vicodin and stated that "[i]t will be difficult for her to find work with the amount of restrictions required by her injuries." R. 558.

On March 9, 2011, Plaintiff complained to Dr. Wardell about left-shoulder pain that radiated into her fourth and fifth fingers. The examination showed her shoulder had good intrinsic strength, full elevation, and a negative Tinel's test at the elbow and wrist, showing no irritated nerves. R. 565. Dr. Wardell prescribed Vicodin and Mobic. R. 565.

On April 7, 2011, Dr. Wardell completed an RFC evaluation. R. 543. Dr. Wardell opined that Plaintiff could sit at least six hours and stand/walk at least six hours in an eight-hour workday. R. 545. He noted that Plaintiff is not a malingerer, and during a typical workday, Plaintiff would frequently experience pain or other issues severe enough to interfere with attention and concentration. R. 546. Additionally, he noted that there would likely be days that

8

Plaintiff would be unable to work because of pain. R. 547. Dr. Wardell opined that Plaintiff was capable of low stress work. R. 546. He further opined that she could rarely lift ten pounds, never lift 20 pounds, and had limitations with grasping, turning, twisting, and reaching overhead with her left arm and hand. R. 545-47. Dr. Wardell also opined that Plaintiff's impairments would cause her to be absent about four days per month. R. 546.

On May 27, 2011, Plaintiff reported a right-shoulder injury after falling at her home six days earlier. R. 565. The examination revealed elevation limitations, but there was no bruising or fracture, with some diffuse deltoid tenderness. Dr. Wardell administered an anti-inflammatory injection. R. 565.

On June 28, 2011, Dr. Wardell completed a Physical Capacities Checklist indicating that Plaintiff could sit, stand, and walk for eight hours during an eight-hour workday, occasionally lift up to 20 pounds, occasionally push/pull up to 10 pounds, and could perform repetitive arm and leg movements. R. 550-51.

On August 3, 2011, Dr. Wardell completed another RFC evaluation. This time he concluded that Plaintiff had no limitations with her right or left hands and fingers, but opined she could not reach with either arm. R. 556. He also concluded that Plaintiff would miss three days of work per month. R. 556. He also noted that Plaintiff suffers from drowsiness, dizziness, and nausea, as side effects of her medication. R. 553. His other findings follow from his previous RFC evaluation.

On August 3, 2011, Dr. Wardell completed a pain questionnaire, where he opined that Plaintiff's pain would cause some interference, but the pain would not cause frequent interruptions in concentration or prevent her from focusing on the task at hand. She also would not miss any work because of pain. R. 557.

### B. Plaintiff's Statement and Hearing Testimony

At the ALJ hearing, Ms. Cowan testified regarding her life, daily activities, and medical conditions. Ms. Cowan said she has a high school education. R. 49. She is single and has a daughter, who was 13 at the time of the ALJ hearing, and a son who was 21 at that time. R. 51. Ms. Cowan is 5'2" and at the time of the hearing, she weighed 324 pounds. When she was working she weighed 250 pounds.

Plaintiff was last employed on May 27, 2009, as an assembler for Stihl Incorporated. R. 49-50, 137. In this job, she worked at various stations assembling blowers, chain saws, and back pack blowers. R. 50. She frequently had to lift up to 40 pounds. R. 50. Prior to working for Steel Incorporated, she worked for Gwaltney as a packer and she would weigh and pack three pound packs of bacon. R. 50. That job required regularly lifting 50 pounds. R. 50.

Ms. Cowan testified that she sleeps most of the day and that she tried to wake up with her daughter and get her ready, but that often times Ms. Cowan falls back asleep. R. 51. Ms. Cowan wrote in her Function Report, that each day she gets up at 5 a.m. or 6 a.m., and lets her dogs out and then feeds them. R. 173. She also testified that her daughter has to help her bathe and has to help her in the bathroom, because Ms. Cowan is unable to clean herself after a bowel movement. R. 51.

Plaintiff also reported that when she gets up she tries to move around and do things like household cleaning, but she said there was not a task she can complete because she cannot concentrate or function properly. R. 53, 59. She said that she often times finds herself tired and sleepy. R. 53. She said that she tried to stay awake and talk to her daughter as her daughter gets ready for school, but is often unable to stay awake. R. 55. Most days she sits in her chair and will go back to sleep, waking up periodically. R. 55. In her function report, Plaintiff wrote that she

does go out and pays her bills. R. 173. She also wrote in her function report that she washes clothes with some help, and she cleans bathrooms. R. 175. She noted that she is unable to do yard work or vacuum because of her pain. R. 176.

At her hearing, Plaintiff said she sometimes cooks, but mostly has someone else make her food. R. 60. However, in her function report, she said she prepares some type of food each day and may prepare a full meal twice a week. R. 175. She noted also that she cannot lift the pans or reach for items because of her pain. R. 175.

Plaintiff told the ALJ that she drives only occasionally and mostly just back and forth to doctors' appointments. R. 49. She said that she does not do grocery shopping on a regular basis, but that she did drive to the ALJ hearing and had no problem doing so, except for some pain in her arms and hands. R. 59. In her function report, Plaintiff noted that she does shop for groceries, clothes and household items, but that she is unable to carry bags when shopping. R. 176. She estimated that she shops once a month for a few hours. R. 176.

In discussing her nighttime sleeping, Ms. Cowan said she uses a CPAP Machine, but that at one point she stopped because she could not go back to the doctor since she did not have insurance. She said that recently she was able to go back and have her sleep studies done, and is now back on the CPAP machine. R. 53.

Plaintiff testified about her shoulder problems and said she was unable to lift 10 pounds. R. 52. She also said that she can only walk about a block and has pain in her knees and legs. R. 54. She also told the ALJ that she cannot lie down and sleeps in a recliner because in a bed she would lie on her stomach, which places pressure on her hands, causing them to ache. R. 54.

She testified that the only activities outside of the house she does are going to church and bible study. R. 56, 61. She also reported that her pain medication made her sleepy. R. 56-57. She

testified that she has no problem sitting, but cannot stand for long periods of time. R. 62.

A Vocational Expert (VE), Ms. Edith Edwards, also testified at the hearing. Ms. Edwards classified Plaintiff's past work as an assembler and packer as medium, unskilled labor and her work as a cashier as light, unskilled work. The ALJ asked the VE about a hypothetical person of Plaintiff's age, education and work background, who

> can lift, carry, push, pull up to 20 pounds occasionally, 10 pounds frequently from waist to chest level, avoid overhead work activity, stand and walk six hours within an eight hour work day and sit six hours within an eight hour work day but [can] stand and walk no more than 15 to 30 minutes at a time before sitting for about 30 to 60 minutes, avoid climbing ladders, ropes and scaffolds, crawling and kneeling, perform other postural movements occasionally, avoid constant reaching and the job needs close proximity to a restroom such as in an office setting on the same floor.

R. 65.

Based on this hypothetical person, the VE testified that the person could not do Plaintiff's past work, but that there were light or sedentary jobs that the person could do. R. 65.  As for light work, the VE cited to the example of an information clerk, of which there are 590 jobs locally (the greater Hampton Roads area) and 118,000 nationally. R. 65. The VE also gave a second example of an office helper and found there were 685 such jobs locally and 137,500 nationally. R. 65. As for a sedentary job, the VE cited as an example an order clerk and found there were 525 such jobs locally and 106,000 nationally. R. 65. A second example of a sedentary job was a surveillance system monitor and the VE said there were approximately 1,250 such jobs locally and 250,000 nationally. R. 65. The ALJ clarified that none of these jobs required production quotas. R. 66.

On examination by Plaintiff's counsel, the VE stated that none of these jobs allowed for unscheduled breaks at the person's discretion and none allowed for the person to take an hour to hour and a half nap. R. 66. The VE also stated that none of the jobs would allow a person to be

off task for 25 percent of the time. R. 66.

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an

error of law. *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for a period of disability and DIB under section 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. §

404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

After reviewing the record, the Court RECOMMENDS that the ALJ's decision be UPHELD.

**A. ALJ's Decision**

In this case, the ALJ found the following regarding Plaintiff's condition. First, Plaintiff last met the insured status requirements of the Act on December 31, 2014. R. 14. Second, Plaintiff did not engage in substantial gainful activity since her alleged onset of disability on May 27, 2009. R. 14. Third, Plaintiff's sleep disorders, major joint dysfunction, and obesity constitute severe impairments. R. 14. The ALJ also found that Plaintiff other alleged impairments including high blood pressure, gastroesophageal reflux disease (GERD), migraines, and high cholesterolemia were non-severe. R. 14. Fourth, Plaintiff did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 15. Fifth, Plaintiff has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) with the additional limitations that her work environment must have a close proximity to the restroom and she is limited to unskilled work without production quotas. R. 16. Sixth, Plaintiff is unable to perform any past relevant work. R. 19. Seventh, that Plaintiff was 36 years old at the alleged onset date, which is defined as a younger individual for purposes of the analysis. R. 19. These findings led

the ALJ to conclude that when considering Plaintiff's age, education, work experience and RFC, there are a significant number of jobs that Plaintiff can do in the national economy and that Plaintiff was not under a disability from the alleged onset date to the date of his opinion on March 27, 2012. R. 20-21.

In her Memorandum in Support of her Motion for Summary Judgment, Plaintiff alleges the ALJ made five errors in this case. Pl.'s Br 2 (ECF No. 9). First, Plaintiff argues the ALJ failed to acknowledge limitations due to narcolepsy when determining the RFC. *Id.* Second, Plaintiff objects to the ALJ's finding regarding Plaintiff's credibility. *Id.* Third, Plaintiff argues that the ALJ failed to consider Plaintiff limitations to do full-time work. *Id.* Fourth, Plaintiff argues that the ALJ improperly discounted portions of the treating physician's opinions when determining Plaintiff's limitations. *Id.* Fifth, Plaintiff objects to the hypothetical posed to the Vocational Expert. Id. at 28. After reviewing the parties' briefs, the Court RECOMMENDS the ALJ's opinion be UPHELD.

### B. Issue of Narcolepsy in ALJ's RFC

Plaintiff argues that the ALJ should have incorporated Plaintiff's narcolepsy into his opinion, and in particular, the ALJ should have included additional limitations on Plaintiff's work due to the narcolepsy. Pl.'s Br. 17-18. Plaintiff argues that although narcolepsy is not one of the Administration's listed impairments, the ALJ should have included it as an impairment because the severity of narcolepsy is medically equal to or greater than a listed impairment, nonconvulsive epilepsy. *Id.* at 17. Plaintiff also objects to the hypothetical posed to the VE because it did not include any limitations related to narcolepsy. *Id.* at 18. The argument regarding the hypothetical will be discussed in Part IV.E.

At a minimum, Plaintiff argues, that the RFC should have involved a limitation that

Plaintiff cannot do work that requires she drive or operator heavy or dangerous machinery and Plaintiff cannot do work that requires work in high, unstable, or otherwise unsafe places. *Id.* at 18.

The ALJ discussed the issue of narcolepsy and Plaintiff's sleep disorders in his opinion. The ALJ noted that the medical records show that after starting treatment with Dr. Barot, Plaintiff experiences a positive response to her sleep related issues. R. 17. The ALJ discussed how Plaintiff experienced regression when she gained significant weight and she was unable to use the CPAP machine. R. 17. However, the ALJ noted that at her September 24, 2009 visit with Dr. Barot, Plaintiff reported he had been using Sodium Oxybate each time without side effects and that she wanted to restart her CPAP machine use. R. 17. At that visit, she also reported feeling that her condition was improving and that she want to return to work soon. R. 17. Finally, the ALJ noted that the doctor expressed confidence that Plaintiff would benefit maximally from the therapy and only advised Plaintiff to avoid driving or operating machinery if she felt sleepy. R. 17. Further, the ALJ found that based in Plaintiff's testimony and reports, her sleep issues did not significant limit her daily activities. R. 19.

The issue here is whether there is substantial evidence to support the ALJ's RFC, particularly with regards to whether there is substantial evidence to support the ALJ's decision to not place narcolepsy-related limitations in the RFC. When reviewing for substantial evidence there must only be enough "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

Plaintiff was diagnosed with narcolepsy and sleep apnea by Dr. Barot. R. 219. However, with regards to the RFC, the question is not diagnosis, but whether that condition requires

limitations on Plaintiff's work. In this case, the ALJ's decision to not include sleep-related limitations in the RFC is supported by substantial evidence. The first piece of evidence is Dr. Barot's reports. Dr. Barot notes that Plaintiff has been able to take Sodium Oxybate every night without side effects. R. 206. Additionally, although Plaintiff stopped using her CPAP machine from time to time, she was refitted for the machine on a number of occasions. R. 53, 206. This was confirmed at the ALJ hearing, when Plaintiff testified that she recently underwent sleep testing. R. 53. At the end of her treatment in 2011, Dr. Barot noted Plaintiff did not show clear evidence of narcolepsy in a sleep test. R. 574, 576. Dr. Barot's reports generally indicated progress in Plaintiff's condition. *See* R. 205-211.

Additionally, the ALJ's decision was supported by evidence as to Plaintiff's daily life. Plaintiff's information on her function report and her testimony at the ALJ hearing provided different views of her daily life. Her function report discussed her ability to drive, go shopping, help take care of her daughter, take care of her dogs, and prepare food on a daily basis. R. 173-176. In her testimony, Plaintiff stated that she only drove to doctor's appointments, she did not go grocery shopping, and she did not regularly prepare food. R. 49, 59, 50. Clearly, the ALJ gave more credibility to the function report statements. R. 19.

In reviewing for substantial evidence, the Court does not reweigh evidence or make credibility determinations. *See Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. The ALJ's decision to give more weight to the function report, rather than Plaintiff's testimony, is a decision that lies with the ALJ. Based on the information within the function report, the ALJ's finding that Plaintiff's sleep related disorders do not impact her daily life is supported by substantial evidence. Plaintiff reports being able to shop, cook, take care of household chores and take care of her children. Based on this evidence the ALJ's findings are supported by substantial

evidence.

### C. Credibility Assigned to Statements of Plaintiff

Plaintiff's second assignment of error is that the ALJ failed to properly consider Plaintiff's credibility. Pl.'s Br. 21. Plaintiff argues that the ALJ should have found her testimony concerning the intensity, persistence and limiting effects of her impairments credible, and further argues that the ALJ should have specified reasons for his decision. *Id.* In particular, Plaintiff alleges the ALJ failed to provide sufficient reasoning for not examining Plaintiff's impairments in totality. *Id.* at 22.

The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individual's ability to work. *Id.* at 595.

The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96. Social Security Ruling 96-7p states that the evaluation of a plaintiff's subjective complaints must be based on the consideration of *all* the evidence in the record, including, but not limited to: (1) medical and laboratory findings, (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment,

response, prior work record, and the alleged symptoms' effect on the ability to work.

In making his credibility determination, the ALJ acknowledged that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. R. 16. The ALJ then found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 16.[4]

Again, there is sufficient evidence on the record to support the ALJ's findings. Although Plaintiff alleged significant hardship in her daily life, her functional report indicated that she is able to take care of her dogs and her daughter, prepare food, drive as needed, shop once a month, and do household cleaning. R 173-176. Additionally, although Plaintiff alleged and testified to significant pain, Dr. Wardell's reports indicated progress in both shoulder pain and range of motion. *See e.g.*, R. 560. As far as her sleep issues were concerned, the ALJ pointed to Dr. Barot's report indicating that Plaintiff's issue were controlled when she followed treatment. R. 17.

From this discussion, the ALJ can reasonably conclude that Plaintiff's allegations are not entirely credibility because they do not follow from her contemporaneous reports in her function reports and they do not follow from her objective medical records. Based on the ALJ's

---

[4] This final statement of the ALJ appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013). The Seventh Circuit in particular has been critical of the use of this verbiage, going so far as to call it "meaningless boilerplate [language]." *Parker*, 597 F. 3d at 922. In and of itself, this language is problematic because it places the cart before the horse in terms of making an RFC determination with all available evidence, including the credibility determination. *See* 20 C.F.R. § 404.1529(c)(4); *see also Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."). However, in this case, "it is clear in the pages that follow the boilerplate language in this case, the [ALJ] considered the evidence of the record and provided sufficient support for both his RFC finding and his determination of plaintiff's credibility regarding the limiting effects of her condition."*Racey*, 2013 WL 589223, at *6. Therefore, no error of law occurred because the ALJ's provided significant discussion of the particular credibility issues.

discussion and the evidence on the record from both Plaintiff and her doctors, the ALJ's credibility finding is supported by substantial evidence.

### D. Plaintiff's Ability to Work Full-Time

Plaintiff also objects to the ALJ's opinion on the grounds that the ALJ erred in assessing Plaintiff's RFC because he did not provide evidence that Plaintiff can work full time. The ALJ's RFC determination is based on the premise that a person can work eight-hour day, five days a week. *See* SSR 96-8p. However, Plaintiff alleges that such a premise is not supported by substantial evidence in this case, and therefore the ALJ erred. Pl.'s Br. 23.

This argument is a second attack on the ALJ's decision to not include certain sleep related limitations in Plaintiff's RFC. *See id.* In this situation, Plaintiff objects to the ALJ not including a limitation that Plaintiff would need to be absent from work for three to four days per month and that Plaintiff would need to take unscheduled breaks throughout the day. *Id.*

This argument is essentially the same as the first, and questions whether there is substantial evidence to support the ALJ's RFC with regards to sleeping disorders. *See supra* Part IV.B. As the Court discussed, the ALJ's determination is supported by substantial evidence, and for the same reasons, the ALJ's decision to not include a limitation with regards to full time work is also supported by substantial evidence.

### E. Treating Physician's Opinion

Plaintiff's argument with regards to this issue breaks down into two separate arguments. First, Plaintiff argues that the ALJ examined Plaintiff's impairments individually, rather than taking them all together, and that the ALJ did not discuss Plaintiff's neck, back, and shoulder pain. Pl.'s Br. 24. Second, Plaintiff argues that the ALJ did not follow the treating physician's rule and instead picked and chose pieces of the treating doctor's opinion to give weight. *Id.* at 25.

As the Court reads the ALJ's opinion, it finds no evidence that the ALJ failed to consider Plaintiff's neck, back, and shoulder pain. In fact, the ALJ's opinion discusses Plaintiff's visits with both Dr. Wardell and the Portsmouth Community Health Center. *See* R. 18. Further, the ALJ goes into great detail discussing Plaintiff' shoulder issue and shoulder surgery. *Id.* Finally, the ALJ placed limitations related to Plaintiff's physical pain and limitations into the RFC. These limitations included limiting the amount of weigh Plaintiff would lift, limiting standing time to only 15 to 30 minutes at a time, limiting Plaintiff to work that would not require crawling, kneeling, climbing ladders, ropes or scaffolds, and limiting postural movements and constant reaching. R. 16. This RFC takes into account Plaintiff's pain and physical limitations as described by her doctors and there is no indication that the ALJ examined each type of pain individually and not in total. With this in mind, the Court finds the first part of Plaintiff's argument to be unsupported by the record.

The Court also finds that Plaintiff's argument that the ALJ did not cite specific evidence for his decision and did not consider all of the evidence on the record unfounded. *See* Pl.'s Br. 25. Plaintiff alleges that the ALJ did not consider the totality of the evidence from Dr. Wardell. The Court disagrees. The ALJ discussed a number of Dr. Wardell's findings, discussed the Functional Capacity Evaluation ordered by Dr. Wardell, and discussed Dr. Wardell's opinions regarding Plaintiff's limitations. *See* R. 18. The ALJ more than sufficiently examined and discussed Dr. Wardell's opinions, and by addressing these particular findings by both Dr. Wardell and Dr. Barot, the ALJ provided specific reasons for his opinion.

Plaintiff's second part of this argument focuses on the treating physician rule. A treating source's opinion on issues regarding the nature and severity of an impairment is to be given controlling weight if it is well supported by medically-accepted clinical and laboratory diagnostic

22

techniques and is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1526(b), 404.1527(d), 416.927(d)(2). However, a treating physician's opinion is to be accorded less weight if the opinion is not supported by clinical evidence or is inconsistent with other substantial evidence. *See Craig*, 76 F.3d at 590.

Plaintiff does not argue that Dr. Wardell's opinions should be give controlling weight, but argues that the ALJ picked and chose parts of Dr. Wardell's opinions that supported the ALJ's finding. Pl.'s Br. 27. Although the ALJ gave Dr. Wardell's opinions "significant weight," *see* R. 19, Plaintiff argues that the ALJ did not actually give Dr. Wardell's opinion significant weight because he did not consider all of Dr. Wardell's opinion. The Court must disagree with Plaintiff.

In making this argument, Plaintiff cites to specific parts of Dr. Wardell's opinions that she believe the ALJ did not consider. First, she cites to Dr. Wardell's finding of physical limitation related to Plaintiff's shoulder. Pl.'s Br. 27. The ALJ, however, adopted Dr. Wardell's opinion with regards to Plaintiff's loss of range of motion in her left shoulder and her decreased grip strength within the RFC. R. 16. Dr. Wardell noted Plaintiff would have issues with certain types of reaching and lifting, and the ALJ's RFC restricted Plaintiff from certain types of movement and from certain postural movement, including constant reaching. R. 16. Further the ALJ discussed these specific findings of Dr. Wardell in his discussion of the RFC. R. 18.

The second example cited by Plaintiff is Dr. Wardell's opinion that Plaintiff would need to take unscheduled breaks once or twice a day for 5 to 10 minutes at a time, and would need to take three to four unscheduled days off per month. Pl.'s Br. 28. As for the one to two, ten minute breaks per day, the Court cannot say that the ALJ did not include this restriction. It seems to be a minor amount of time for a break, and most people would need that type of a short break. The

Court cannot see why such a limitation would need to be included in the RFC.

As for the issue of Dr. Wardell's opinion that Plaintiff would need to take 3-4 days off per month, this opinion is not supported by the objective evidence on the record, and therefore this opinion is not entitled to controlling weight. *See Craig*, 76 F.3d at 590. As noted by the ALJ, Plaintiff's issues, of both her sleep disorders and her physical limitations, are controlled by conservative treatment. R. 18-19. This is supported on the record by Dr. Barot's opinion that even just using Sodium Oxybate, Plaintiff saw "a clear benefit" and increased work function. R. 208. It is also supported by physical therapy record, which indicates that following her surgery, Plaintiff gained range of motion and reached a point where physical therapy was not necessary. R. 355-58. Finally, Plaintiff's function report indicates that she can cook, clean, take care of her dogs, and from time to time shop. R. 173-176. The ALJ's decision to not include this specific limitation is supported by the objective evidence on the Record and by Plaintiff's own statements regarding her daily life.

It is important to note that Dr. Wardell's RFC evaluation advises that Plaintiff can work, and therefore, is not disabled. R. 553-556. Dr. Wardell opined that Plaintiff was capable of low stress jobs, could sit or stand/walk at least six hours a day, could occasionally lift up to 10 pounds, and could use her hands and fingers the entire eight hour work day. *Id.* This is not to say that Dr. Wardell did not include limitations, but to note that Dr. Wardell never opined Plaintiff was disabled.[5] In the Court's review of the record, the ALJ included the applicable limitations in his RFC and did not err.

---

[5] In her initial brief, Plaintiff objects to the ALJ's decision to not order a consultative exam. Pl.'s Br. 19. However, a consultative exam is unnecessary in this case because neither treating physician opines that Plaintiff is disabled. Dr. Wardell, in his last RFC, made clear that Plaintiff can work with some limitations. R. 553-556. At her last appointment with Dr. Barot, he noted she showed no signs of narcolepsy. R. 574, 576. Based on these assessments, there was no need to have a consultative exam.

**F. Hypothetical to the Vocational Expert**

Plaintiff objects to the hypothetical posed to the Vocational Expert as being insufficient, because it did not include limitations related to narcolepsy, sleep apnea, and concentration difficulties. Pl.'s Br. 28.

At step five of the ALJ's analysis, "the ALJ evaluates the claimant's RFC along with [her] age, education, and work experience, to determine whether the claimant can 'make an adjustment to other work.'" *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009) (quoting 20 C.F.R. § 404.1520(a)(4)(v)). To do that, the ALJ can use the testimony of a Vocational Expert by posing hypothetical situations for the VE's evaluation, as was done in this case. "In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of *all relevant evidence* of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993) (internal citations omitted) (emphasis added).

This argument by Plaintiff is a combination of all of the other arguments made by Plaintiff. In the Fourth Circuit, a hypothetical must include all relevant information in the ALJ's opinion. *See English*, 10 F.3d at 1085. If the ALJ's opinion is not supported by substantial evidence, then the hypothetical may be flawed because it does not include all relevant information. However, that is not the situation in this case. The Court has already discussed why the ALJ's RFC is supported by substantial evidence. Because the RFC is supported by substantial evidence and the hypothetical includes that information from the RFC, *see* R. 65, the ALJ did not err as far as the construction of the hypothetical posed to the VE.

## V.  <u>RECOMMENDATION</u>

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary

Judgment be DENIED; the Commissioner's Cross Motion for Summary Judgment be GRANTED; the final decision of the Commissioner be AFFIRMED; and Judgment be entered in favor of the Commissioner.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

_____/s/_____

Tommy E. Miller

UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 12, 2013